IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

BG PRODUCTS, INC.,

      Plaintiff,

v.                                                Case No. 6:15-CV-1209-JTM-GLR

STINGER CHEMICAL, LLC,

      Defendant.

**MEMORANDUM AND ORDER**

Plaintiff BG Products, Inc. seeks monetary damages against defendant Stinger Chemical, LLC for alleged trademark infringement, unfair competition (in violation of the Lanham Act, 15 U.S.C. § 1114 and common law), violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO") (18 U.S.C. § 1962), tortious interference with contract, and tortious interference with existing and prospective business relationships.   Plaintiff also seeks to have defendant enjoined from manufacturing and distributing counterfeit products sold under plaintiff's trademark and trade name.   This matter is before the court on defendant's Motion to Dismiss for Lack of Personal Jurisdiction pursuant to FED. R. CIV. P. 12(b)(2) (Dkt. 11).   For the reasons stated below, defendant's motion is granted.

**I.      Factual and Procedural Background**

This case arises out of the alleged counterfeit manufacture of one of plaintiff's products, the BG 44K Fuel System Cleaner.   Plaintiff manufactures and distributes automotive maintenance products and equipment for automobile fuel systems, engines, transmissions, brakes, power steering, cooling, battery, drive line, and climate control systems.   Dkt. 5-1, at 15.

Its trademark has been registered with the United States Patent and Trademark Office since January 20, 1976.  Dkt 5-1, at 15.  Plaintiff markets and sells its products internationally through individual international distributors, who are assigned a designated and exclusive geographic sales region.  Dkt. 5-1, at 15.  John Tsou was one of these international distributors who was assigned the geographic areas of Malaysia, Taiwan, and certain provinces and municipalities in China.  Dkt. 5-1, at 15.

In order to become one of plaintiff's international distributors, Tsou entered into a Distributor Agreement with plaintiff in September 1995.  Dkt. 5-1, at 15.  This Agreement allowed Tsou to act as plaintiff's sole distributor in his assigned areas.  Dkt. 5-1, at 15.  Plaintiff and Tsou renewed this Agreement a number of times, the last time being in September 2005. Dkt. 5-1, at 15.  Among other provisions, the Agreements provided as follows:

> [BG Products] grants to [Tsou] the exclusive and non-transferable right and license to use its trade name, trademarks, labels, copyrights and other advertising materials in the marketing of the Market's present and future products throughout the area described above.
>
> All goodwill established in [Tsou's] area by the distribution of said products shall be deemed the sole and exclusive goodwill of [BG Products] and its products, and upon termination of this agreement, or the prior or earlier termination of [Tsou's] right to import [BG Products's] products, [Tsou] shall immediately discontinue, abandon, cease and desist from the use of [BG Products's] labels, trademarks, trade names and every part thereof, in any and every manner whatsoever.
>
> [Tsou] shall not at any time during or after the term of this agreement, or after ceasing distribution of [BG Products's] products, use or employ any colorable imitations of [BG Products's] trade names, trademarks or labels, or any part thereof, or anything similar thereto.

Dkt. 5-1, at 16.  The Agreements also contained a Kansas choice of law provision.  Dkt. 5-1, at 19.  According to plaintiff, its contractual relationship with Tsou terminated in July 2012.  Dkt. 5-1, at 16.

On or about March 9, 2013, plaintiff's representatives attended a meeting with Shanghai General Motors ("SGM") and Shanghai Dongyu ("Dongyu"), two China-based companies that obtained plaintiff's products exclusively by and through Tsou.  Dkt. 5-1, at 16-17.  The purpose of the meeting was to discuss the ramifications of SGM's purchase of counterfeit products bearing plaintiff's trademark on their label from Dongyu.  Dkt. 5-1, at 16-17.  At that time, Dongyu allegedly provided plaintiff documents that reflected that the counterfeit products at issue were manufactured by defendant.  Dkt. 5-1, at 16-17.

During a subsequent visit to China in December 2013, plaintiff's representatives found for sale, to the general public, product, specifically BG 44K Fuel System Cleaner, bearing plaintiff's trademarks.  Dkt. 5-1, at 17.  The bottom of the label read as follows:

**MANUFACTURE [sic] BY STINGER CHEMICAL CORP**
**HOUSTON TEXAS MADE IN THE USA**
**UNDER THE LICENSE OF SOHO STAR CORP FOR BG CHINA**

Dkt. 5-1, at 17.  SOHO Star Corp and BG China are companies owned by Tsou.  Dkt. 5-1, at 17. Counterfeit products bearing plaintiff's labels were allegedly manufactured as late as April 2014 and are apparently still available for sale in the Asian marketplace.  Dkt. 5-1, at 17.

On January 16, 2015, the District Court of Sedgwick County, Kansas, in the matter of *John Tsou v. BG Products, Inc.*, No. 12 CV 1716, entered judgment in favor of plaintiff against Tsou and awarded plaintiff $91,034,370 in damages arising out of Tsou's infringement upon plaintiff's trademark and consequent breach of his Distributor Agreement.  Dkt. 5-1, at 17-18. The court also entered a permanent injunction prohibiting Tsou and any companies in which Tsou has or had an interest from utilizing plaintiff's trademarks or identifying information for any purpose, and requiring Tsou to recall anything bearing plaintiff's trademarks or identifying information from the marketplace.  Dkt. 5-1, at 17-18.

Plaintiff now alleges that defendant and its officers knew about Tsou's Distributor Agreements with plaintiff (Dkt. 5-1, at 16) and used that knowledge to obtain plaintiff's trademark and trade name to identify product defendant manufactured as products manufactured by plaintiff.  Dkt. 5-1, at 18.

Plaintiff filed suit against defendant in the District Court of Sedgwick County, Kansas, on March 9, 2015, case number 12 CV 1716, for trademark infringement, unfair competition, RICO violations, and tortious interference with contract.  Dkt. 5-1, at 2-11.  Prior to serving defendant with a copy of the lawsuit and summons, plaintiff filed an Amended Petition on June 3, 2015, adding a claim for tortious interference with existing and prospective business relationships. Dkt. 5-1, at 14-23.  On July 7, 2015, defendant filed a Notice of Removal and Amended Notice of Removal (Dkt. 5), removing this lawsuit to the United States District Court for the District of Kansas on the basis of both federal question jurisdiction and diversity of citizenship between the parties.   On July 14, 2015, defendant filed a Motion to Dismiss plaintiff's claims for lack of personal jurisdiction or, in the alternative, a Motion for Transfer of Venue to the Southern District of Texas (Houston Division) pursuant to 28 U.S.C. § 1404(a).  Dkt. 11.

## II.    Legal Standard

"The standard that governs a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction is well-established: The plaintiff bears the burden of establishing personal jurisdiction over the defendant."  *William A. Edison Tr. No. One v. Pattillo*, 2010 U.S. Dist. LEXIS 130050, at *2 (D. Kan. Dec. 8, 2010) (internal quotations omitted).  The extent of the burden depends on the stage at which the court considers the jurisdictional issue.  *Id*.  The trial court can proceed in several ways, including: (1) reference to only the complaint and affidavits, (2) a pre-trial evidentiary hearing, or (3) waiting until trial itself.  *Id*.

4

When personal jurisdiction "is decided at a preliminary stage by reference to only the complaint and affidavits, the plaintiff need only make a prima facie showing of personal jurisdiction." *Id.* "The plaintiff may carry this burden 'by demonstrating, via affidavit or other written materials, facts that if true would support jurisdiction over the defendant.'" *Id.* (quoting *TH Agric. & Nutrition, LLC v. Ace European Grp. Ltd.*, 488 F.3d 1282, 1286 (10th Cir. 2007)). If the plaintiff meets the burden, the defendant must "present a compelling case demonstrating 'that the presence of some other considerations would render jurisdiction unreasonable.'" *Thermal Components Co. v. Griffith*, 98 F. Supp. 2d 1224, 1227 (D. Kan. 2000) (citing *OMI Holdings, Inc. v. Royal Ins. Co. of Can.*, 149 F.3d 1086, 1091 (10th Cir. 1998)). "If the parties present conflicting affidavits, all factual disputes must be resolved in the plaintiff's favor, and 'the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party.'" *Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995) (internal citations omitted).

## III.    Discussion

Plaintiff has alleged personal jurisdiction under both federal question jurisdiction (trademark infringement and RICO violation claims) and diversity jurisdiction. The Tenth Circuit has held that

> in a federal question case where jurisdiction is invoked based on nationwide service of process, the Fifth Amendment requires the plaintiff's choice of forum to be fair and reasonable to the defendant. In other words, the Fifth Amendment protects individual litigants against the burdens of litigation in an unduly inconvenient forum.

*Peay v. BellSouth Med. Assistance Plan*, 205 F.3d 1206, 1212 (10th Cir. 2000) (internal citations omitted). Analysis under the Due Process Clause of the Fifth Amendment is identical to that under the Fourteenth Amendment. *Id.* at n.5.

5

With regard to diversity jurisdiction, "personal jurisdiction over a nonresident defendant is determined by the law of the forum state." *Caldwell-Baker Co. v. S. Ill. Railcar Co.*, 225 F. Supp. 2d 1243, 1259 (D. Kan. 2002). "The proper inquiry is, therefore, whether the exercise of jurisdiction is sanctioned by the long-arm statute of the forum state and comports with due process requirements of the Constitution." *Federated Rural Elec. Ins. Corp. v. Kootenai Elec. Corp.*, 17 F.3d 1302, 1304-05 (10th Cir. 1994). The Kansas long-arm statute extends the personal jurisdiction analysis to the extent of the United States Constitution. *Id.* As such, this court need not conduct a statutory analysis separate and apart from the due process analysis. *See Emplrs Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1159 (10th Cir. 2010) (internal citations omitted).

The due process analysis consists of two steps. First, the court must consider "whether the defendant has such minimum contacts with the forum state 'that he should reasonably anticipate being haled into court there.'" *Bartile Roofs*, 618 F.3d at 1159-60 (quoting *OMI Holdings,* 149 F.3d at 1091). "This minimum-contacts standard may be satisfied by showing general or specific jurisdiction." *Id.* at 1160. "Second, if the defendant has minimum contacts with the forum state, we determine 'whether the exercise of personal jurisdiction over the defendant offends traditional notions of fair play and substantial justice.'" *Id.* (quoting *OMI Holdings*, 149 F.3d at 1091).

## A.    Minimum Contacts

Plaintiff claims that jurisdiction over defendant is proper on the basis of both general and specific jurisdiction, relying on K.S.A. §§ 60-308(b)(1)(A), 308(b)(1)(G), and 308(b)(2). Section 308(b)(2) provides for the exercise of *general* jurisdiction over a nonresident defendant if the defendant has "substantial, continuous and systematic contact with the state," whereas

section 308(b)(1) provides for the exercise of *specific* jurisdiction over a nonresident defendant if the defendant committed one of the acts enumerated in the statute and the plaintiff's cause of action arises from that act.

### 1.    General Jurisdiction

General jurisdiction permits a court to exercise power over a corporate defendant in "instances in which the defendant's continuous corporate operations within a state are so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities." *Tomelleri v. Medl Mobile, Inc.*, 2015 U.S. Dist. LEXIS 55943, at *8 (D. Kan. Apr. 29, 2015) (quoting *Goodyear Dunlop Tires Ops., S.A. v. Brown*, 131 S. Ct. 2846, 2853 (2011) (internal brackets omitted)).  Prior to recent Supreme Court decisions, Tenth Circuit case law suggested that general jurisdiction existed "so long as a defendant's forum-related contacts [were] 'continuous and systematic.'"  *Id.* (citing *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1078 (10th Cir. 2008)).

However, the Supreme Court recently clarified that even "'substantial, continuous, and systematic' forum-related contacts are insufficient to confer general jurisdiction."  *Id.*  Instead, "the defendant's contacts with the forum must be *so* 'continuous and systematic' as to render it *essentially at home* in the forum State."  *Id.* at *8-9 (quoting *Daimler AG v. Bauman*, 134 S.Ct. 746, 761 (2014) (emphasis in *Tomelleri*) (internal brackets omitted)).  Common instances in which a court may exercise general jurisdiction over a corporate defendant include when the corporate defendant's place of incorporation and/or principal place of business is the forum state. *Id.* at *9 (citing *Daimler AG*, 134 S. Ct. at 760).  "General jurisdiction in a forum other than the defendant's place of incorporation or principal place of business will exist only in '*exceptional cases*' where the defendant's operations in the forum are 'so substantial and of such a nature as

to render the corporation *at home* in that State.'"  *Id.* (quoting *Daimler AG*, 134 S. Ct. at 761 n.19) (emphasis added) (internal brackets omitted).

The Tenth Circuit has set forth four factors to consider when deciding whether a corporation is "at home" in the forum state:

> (1) whether the corporation solicits business in the state through a local office or agents; (2) whether the corporation sends agents into the state on a regular basis to solicit business; (3) the extent to which the corporation holds itself out as doing business in the forum state, through advertisements, listings or bank accounts; and (4) the volume of business conducted in the state by the corporation.

*Tomelleri*, 2015 U.S. Dist. LEXIS 55943, at *10 (citing *Grynberg v. Ivanhoe Energy, Inc.*, 490 F. App'x 86, 95 (10th Cir. 2012)).

Plaintiff alleges, merely by reference to K.S.A. § 60-308(b)(2), that defendant has submitted itself to jurisdiction in Kansas by having substantial, continuous, and systematic contacts with Kansas which would support jurisdiction.  Dkt. 5-1, at 22.  However, plaintiff fails to refute defendant's argument that the contacts between defendant and Kansas are, at *best*, tenuous.

Defendant has no employees or place of business in Kansas.  Dkt. 12-1, at ¶¶ 4, 11.  It does not employ anyone who regularly travels to Kansas to market or sell products.  Dkt. 12-1, at ¶ 12.  In fact, defendant does not even *have* traveling sales representatives.  Dkt. 12-1, at ¶ 12. Defendant's products, which admittedly include after-market chemicals for car care professionals (Dkt. 12-1, at ¶ 6), are only manufactured in Texas.  Dkt. 12-1, at ¶ 7.  Post-manufacture, when defendant labels its products, is done in Houston, Texas.  Dkt. 12-1, at ¶ 8. Defendant can and does ship some of its products unlabeled for private labeling by the customer. Dkt. 12-1, at ¶ 8.  Defendant advertises its car detailing products in print advertisements found in trade magazines, but does not directly target advertisements towards Kansas or its residents.

Dkt. 12-1, at ¶ 13.  More importantly, defendant does not advertise its *additive* products (those that are similar to the counterfeit product in question) through print advertisements outside Texas.  Dkt. 12-1, at ¶ 13.  Defendant has never appeared at a trade show in Kansas, featured its products at a trade show in Kansas, held real estate interests in Kansas, had an office in Kansas, maintained any bank accounts in Kansas, or had a local phone number in Kansas.  Dkt. 12-1, at ¶¶ 14, 16-19.  From 2001 through 2015, defendant's products have only been shipped to five customers in Kansas, and all of these products were defendant's "make-ready, detailing and car wash" products, not additive products.  Dkt. 12-1, at ¶ 21.

The court does not find that this is the "exceptional case" where defendant is "at home" in Kansas despite being domiciled and maintaining its principal place of business elsewhere. Accordingly, defendant lacks the requisite "continuous and systematic" contacts with Kansas to establish general jurisdiction in this state.

### 2.    Specific Jurisdiction

Plaintiff also contends that defendant has sufficient minimum contacts to support specific jurisdiction in Kansas, although, again, it alleges so only by citing the Kansas statute, K.S.A. § 60-308(b)(1).  Dkt. 5-1, at 14.

"The minimum contacts necessary for specific personal jurisdiction may be established where a defendant has purposefully directed its activities toward the forum jurisdiction and where the underlying action is based upon activities that arise out of or relate to defendant's contacts with the forum."  *Schlumberger Tech. Corp. v. Greenwich Metals, Inc.*, 2008 U.S. Dist. LEXIS 87485, at *10 (D. Kan. Oct. 27, 2008) (citing *Trujillo v. Williams*, 465 F.3d 1210, 1218 (10th Cir. 2006)).  "The purposeful direction of activities toward a resident of the forum state requires an out-of-state defendant to commit some act by which it purposefully avails itself of

the privilege of conducting activities with the forum state, thus invoking the benefits and protections of its laws." *Id*. at *11 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).

In an intentional tort context, courts in the Tenth Circuit apply the "effects test" set forth in *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063 (10th Cir. 2008). This test is derived from the Supreme Court's decision in *Calder v. Jones*, 465 U.S. 783, 789-90 (1984), and allows a plaintiff to establish purposeful direction by showing that the defendant took: "(a) an intentional action, that was (b) expressly aimed at the forum state, with (c) knowledge that the brunt of the injury would be felt in the forum state." *Tomelleri*, 2015 U.S. Dist. LEXIS 55943, at *17 (citing *Dudnikov*, 514 F.3d at 1072).

The basis of plaintiff's claims is that defendant *knew* about Tsou's Distributor Agreements, including the provision which obligated Tsou to not utilize plaintiff's trademarks on counterfeit products, and yet somehow still managed to persuade Tsou to breach his Agreements with plaintiff by placing plaintiff's label on products manufactured by defendant. Dkt. 16, at 5. Therefore, at least according to plaintiff, defendant interfered with a Kansas contract. Dkt. 16, at 5.

In situations involving an out-of-state defendant's tortious interference with the *contractual* rights of a forum resident, the Tenth Circuit has held that

> the mere allegation that an out-of-state defendant has tortiously interfered with contractual rights or has committed other business torts that have allegedly injured a forum resident does not necessarily establish that the defendant possesses the constitutionally required minimum contacts. Instead, in order to resolve the jurisdictional question, a court must undertake a particularized inquiry as to the extent to which the defendant has purposefully availed itself of the benefits of the forum's laws.

*Far West Capital, Inc. v. Towne*, 46 F.3d 1071, 1079 (10th Cir. 1995).

Both parties cite *Far West Capital* to demonstrate that this court has, or, from the point of view of defendant, does *not* have specific personal jurisdiction. According to plaintiff, *Far West Capital* stands for the proposition that "[a] defendant's interference with a forum state contract constitutes purposeful availment and establishes the forum state's personal jurisdiction over it." Dkt. 16, at 6. This is not exactly the case.

In *Far West Capital*, a Utah plaintiff sued a Nevada resident and Oregon corporation in Utah alleging, *inter alia*, tortious interference with a contract. 46 F.3d at 1074. The district court granted a motion to dismiss, finding that Utah courts lacked personal jurisdiction. The Tenth Circuit affirmed, emphasizing that the allegedly tortious acts involved disputes about rights under a series of Nevada-based agreements. *Id*. at 1080. Plaintiff makes the assumption that the court would have reached a "far different conclusion" if the tortious interference claim was predicated upon a forum-state contract. Dkt. 16, at 6.

There is, however, one critical distinction between the facts in *Far West Capital* and those in the case at hand: the parties in *Far West Capital* were actually the parties to the underlying contract. 46 F.3d at 1073. In fact, this is largely true of *all* of the cases that plaintiff relies upon for its conclusion that all that is required to establish personal jurisdiction in tortious interference with contracts cases is that the contract be in the forum state.[1] Here, it is clear and

---

[1] *See, e.g., Cal Caulfied & Co. v. Colonial Nursing Homes, Inc.*, 642 F. Supp. 777 (D. Kan. 1986) (parties entered into contract and the defendant later assigned a portion of the project contemplated by the contract); *Astro-Med, Inc. v. Nihon Kohden Am., Inc.*, 591 F.3d 1 (1st Cir. 2009) (the defendant was aware of the employment agreement at issue, even going so far as to have counsel review the agreement); *Scotts Co. v. Aventis S.A.*, 145 Fed. Appx. 109 (6th Cir. 2005) (the defendants were successors-in-interest to a master contract with the plaintiff); *Remick v. Manfredy*, 238 F.3d 248 (3d Cir. 2001) (parties had a contractual relationship for the plaintiff to represent the defendant as special counsel); *Miss. Interstate Express, Inc. v. Transpo, Inc.*, 681 F.2d 1003 (5th Cir. 1982) (oral agreement between the parties and an ongoing relationship where the plaintiff supplied trucks to the defendant on an open account basis); *Fleischli v. North Pole US, LLC*, 2013 U.S. Dist. LEXIS 66850 (E.D. Mo. May 10, 2013) (the plaintiff sued the former employer and related and controlling entities for breach of employment agreement); *X-Tra Light Mfg. P'ship v. Midwest Illumination, Inc.*, 2007 U.S. Dist. LEXIS 10513 (S.D. Tex. Feb. 12, 2007) (parties had a contract regarding the defendant's purchase of products from the plaintiff and the defendant's president and CEO was accused of tortiously interfering with the plaintiff's contracts and business relationships); *Nat'l Occupational Health Servs., Inc. v. Advanced Indus. Care*, 50 F. Supp. 2d 1111 (N.D. Okla. 1998) (the defendant

undisputed that defendant was *not* party to, in any way, the contract at issue.  Defendant avers, and plaintiff fails to rebut, that it did not even *know* of the Distributor Agreements between plaintiff and Tsou until it was served with this lawsuit.  Dkt. 12, at 12.  Moreover, plaintiff fails to even allege, let alone establish, even for purposes of making a *prima facie* case, that defendant and Tsou knew each other at *all*.

By focusing solely on the *location* of the contract for the purpose of establishing jurisdiction, plaintiff misses *Far West Capital's* emphasis on the relationship of the parties.  *Far West Capital* goes on to state that, in analyzing whether personal jurisdiction exists in this tortious interference context, the court must examine "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing.  In addition, we examine the contacts created by the out-of-state defendant in committing the alleged tort."  46 F.3d at 1079-80.

The only way plaintiff ties defendant to the contract at issue is to make the bald assumption that "[d]efendant and its officers knew about Tsou's Distributor Agreements with BG Products at all times relevant to this lawsuit."  Dkt. 5-1, at 16.[2]  In response, defendant submits the sworn affidavit of Warren D. Davis, defendant's President and Manager, which avers that: (1) defendant was never a party to any agreement between plaintiff and Tsou; (2) defendant was never a subcontracting party or assignee to any agreement between plaintiff and Tsou; (3) Tsou has never been a member of defendant, nor held a position, contract or otherwise, with

---

was accused of tortiously interfering with a contract it had with the plaintiff); *Fegert, Inc. v. Chase Commercial Corp.*, 586 F. Supp. 933 (D. Nev. 1984) (the plaintiff obtained financing from the defendant for commercial equipment); and *Preussag Energie, GMBH v. Well Constr. Teams, Inc.*, 2000 Tex. App. LEXIS 8512 (Tex. App. 2000) (parties connected through a consulting agreement).

[2] Elsewhere in its Amended Complaint, plaintiff alleges that defendant had "actual or constructive knowledge of the Distributor Agreement and its restrictions and requirements" (Dkt. 5-1, at 20), and defendant "colluded with Tsou and persuaded Tsou to breach his Distributor Agreement." (Dkt. 5-1, at 21).

defendant, nor is he a private investor in defendant; (4) none of defendant's members have ever been involved in Tsou's entities; and (5) none of defendant's members or employees had any knowledge of the Distributor Agreements, or reviewed them in any way.  Dkt. 17-1.

As noted above, "the mere allegation that an out-of-state defendant has tortiously interfered with contractual rights or has committed other business torts that have allegedly injured a forum resident does not necessarily establish that the defendant possesses the constitutionally required minimum contacts."  *Far West*, 46 F.3d at 1079.  Plaintiff offers nothing more than mere allegations that defendant had knowledge of the contract between plaintiff and Tsou and therefore fails to connect the dots between defendant and Tsou and between defendant and plaintiff such that an exercise of specific personal jurisdiction would be appropriate.  Accordingly, the court finds that plaintiff fails to establish that defendant has the requisite minimum contacts with Kansas.

Because the court finds it lacks personal jurisdiction in this matter, it declines to undertake analysis on defendant's alternative request for a change of venue.

**IT IS THEREFORE ORDERED** this 25th day of August, 2015, that defendant's Motion to Dismiss for Lack of Personal Jurisdiction (Dkt. 11 ) is hereby granted.


s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE